### A. L. BLACKMAN and S. K. SCHWENCK v. ROSS C. STONE and others.

### April Term, 1877.

RESCISSION OF CONTRACT IN A PATENT-RIGHT LOST BY DELAY. — A party will lose his right to rescind a contract for an interest in a worthless patented invention if, after full knowledge of the facts, he acts upon the contract, or delays unreasonably to institute legal proceedings for the purpose.

*Helms,* for complainants.
*Osment,* for defendants.

THE CHANCELLOR : — In the year 1872, the complainant Blackman obtained letters-patent from the United States, and in 1873 from the kingdom of Great Britain, for an invention in the wheels of vehicles, known as the "Blackman Military Wheel." During the year 1872, he sold to his co-complainant an undivided one-fourth interest in the patent, and to the defendant J. E. Saunders another undi-

vided one-fourth interest. Efforts were made by these parties, under the style of A. L. Blackman & Co., to introduce the patent to the public, and put the wheels upon the market. A company was formed at Columbus, in the state of Indiana, with a capital of $50,000, of which A. L. Blackman & Co. subscribed $12,500, to be paid out of royalties and profits, to erect suitable buildings and manufacture the wheel. The company was incorporated under the style of the Columbus Blackman Military-Wheel Company, its capital stock, other than that subscribed by A. L. Blackman & Co., and about $1,250 lost by insolvency, being paid in, and went into operation. By its contract with A. L. Blackman & Co., it acquired an undivided one-fifth interest in the patent throughout the United States, except the right to make for, or vend to, the United States government; and A. L. Blackman & Co. obligated themselves not to establish any other manufactory in the state of Indiana, for private use, nor to establish more than four other factories for private use in the United States. The company were to pay the patentee a royalty of $1 for every set of wheels made by them. In the latter part of the year 1873, this company notified Blackman to take no more orders for wheels, and in July, 1874, the manufacture of the wheels was, by a vote of the directory, permanently abandoned. The privilege of making and vending the wheel appears to have been conceded to a corporation at Nashville, upon certain terms, which seems, after the making of a few wheels, to have been abandoned. Negotiations were also had with parties in Pennsylvania and other states, which fell through.

In this situation of things, the complicated transactions detailed in the pleadings and proof began between the complainant Blackman and the defendant Stone, in the month of May, 1874. On the 8th of that month, the former sold to the latter one-fourth of his one-half interest "in the title, management, and control" of the invention. The consideration recited in the agreement, which was reduced to

writing, was the sum of $22,000, of which $200 were paid in cash, and Stone gave his two notes for $400 each, payable on the 15th of June and July, 1874, and two other notes for $500 each, payable on the 10th of October and November, 1874. The residue of the consideration, $20,000, was to be paid out of the first proceeds of the sales and royalties of the one-eighth interest thus sold, and to secure the payment a lien was retained on the interest sold. By a codicil to the agreement, of the same date, it was agreed that the contracting parties would, at as early a day as possible, buy from the partners of Blackman — namely,. Schwenck and Saunders — any and all of the interest that they can, the purchase to be equally divided between them.

On July 6, 1874, the defendant Saunders does reconvey to Blackman his one-fourth interest for the recited consideration of $1,000, which was paid in two notes of defendant Stone for $500 each, executed at the time and for the express purpose, the payment of the notes being secured by the transfer by Stone to Saunders of the bond of the defendant R. E. Chester for 300 acres of land in Dyer County, West Tennessee, the land being valued in the title-bond at $1,500. On the same day, and as part of the same transaction, Blackman conveys to Stone the one-half of the interest thus acquired, the consideration being the $1,000 evidenced by the two notes of Stone given to Saunders.

On July 29, 1874, Stone, at the instance of Blackman, conveys to Julia T. Walton 200 of the 300 acres of land in the Chester title-bond, to be selected by the grantee "in the month of September, 1874." The consideration recited in the deed is the sum of $2,000, but the real consideration was the surrender to Stone of his obligation for the $20,000 mentioned in the contract of May 8, 1874, and payable in the prospective profits of the one-eighth interest in the patent then sold to Stone. On the same day, Blackman conveys to Stone, formally, this one-eighth interest, reciting the consideration of $22,000 paid.

In the bill, the complainant says, in reference to the deed to Julia T. Walton, that Stone proposed to him to purchase the prospective debt of $20,000 by the conveyance of the 200 acres free from the encumbrance of the Saunders lien, and that he (Blackman) agreed to take the land and release Stone from the payment of the prospective debt of $20,000, " and the trade was accordingly made," he requesting Stone to make the deed to Julia T. Walton direct. The bill does not mention the conveyance to Stone, on the same day, of the original one-eighth sold on May 8, 1874, reciting the consideration as paid. In his deposition, Blackman says that this conveyance reciting the payment of the consideration was made at the request of Stone, merely to show to his parents, and that he promised to return it, but, instead of doing so, fraudulently sent it to Washington, and had it recorded; and that *afterwards* Stone tried to cover up the fraud by selling him (Blackman) the 200 acres of land conveyed in the Julia T. Walton deed, which, says the witness, " I accepted, as the best I could do under the circumstances." But the conveyance of Stone to Julia T. Walton, and the transfer of the one-eighth interest, reciting the payment of the $22,000, are both dated the same day, — July 29, 1874, — and the transfer is acknowledged by Blackman on that day, before a notary public. The transfer of July 6, 1874, is also acknowledged by him the same day. It is obvious that the complainant Blackman's memory is at fault, and the version of the facts contained in his deposition altogether a mistake.

The bill, in this connection, alleges that the title-bond of Chester and the deed to Julia T. Walton are both void for uncertainty in the description of the land.

On August 3, 1874, Blackman conveys to Stone another undivided one-eighth in the patent, the conveyance purporting to be " for value received." The bill says the consideration was the sum of $6,000, to be paid principally out of the proceeds of sales. The answer says the transfer was

delivered conditionally, if the defendant should conclude to accept the terms ; that the obligation for the consideration was worded accordingly, and agreed to be a sale on September 28, 1874. The acknowledgment of Blackman to this transfer bears date February 4, 1875.

These three transfers, — of July 6, 1874, July 29, 1874, and August 3, 1874, — each of an undivided one-eighth of the patent, were all recorded at Washington, by Stone, on August 4, 1875.

On September 28, 1874, Blackman undertook to formally forfeit Schwenck's one-fourth interest in the patent, and to convey to Stone the one-half of the share thus forfeited. The bill does not notice this transaction, and the answer admits that it was abandoned, the forfeiture not being considered of any validity. Stone says that Blackman had agreed to make him equal in the patent without any further consideration, and that the next transaction was had in order to compensate him for the failure to give him a good title to this last one-eighth, which would have made the shares of the two parties even, — each having an undivided half. Blackman, in the bill, only states the transaction, without undertaking to explain it.

The transaction was this : On October 12, 1874, Blackman undertook to convey to Stone the " exclusive shopright " for the manufacture of the patent wheels throughout the United States, reciting a consideration of $1,000, which, it is admitted, was never paid. On the next day, Stone reconveyed one-half of this " exclusive shop-right " to Blackman, reciting a consideration of $500, never paid.

On February 4, 1875, Stone reconveyed to Blackman one-eighth of the rights and privileges acquired under the conveyance of October 12, 1874, the consideration recited being the release and surrender by Blackman to Stone of the latter's obligation of August 3, 1874, — namely, the $6,000 agreed to be paid for the one-eighth interest in the patent then conveyed, principally in prospective profits.

Blackman says that the contract of February 4, 1875, was that Stone, for the consideration of the surrender of his obligation for $6,000, should reconvey to him the one-eighth of the patent-right embraced in the transfer of August 3, 1874; that Stone wrote the conveyance in its present shape fraudulently, and he accepted it without particularly noticing its terms. The instrument itself, besides distinctly referring to the contract of October 12, 1874, adds: " This leaves me three-eighths and Blackman five-eighths interest in his vehicle-wheel invention and patent." This is literally true, if the reconveyance is of a one-eighth in the shop-right. For he then owned exactly three-eighths in the patent and one-half of the shop-right, and one-eighth taken from the latter would leave each party with precisely the same share in the shop-right as in the patent. On the other hand, the reconveyance of one-eighth of the patent would have made the recital of the instrument palpably false as to the shares of the parties in both the patent and the shop-right. A still more conclusive fact, to show that the instrument was intended to be what it purports to be, is that the transfer of August 3, 1874, was acknowledged for record by Blackman on February 4, 1875, — the very day the instrument in question was drawn. That acknowledgment demonstrates that there was no agreement on the same day to cancel the transfer by a reconveyance of the one-eighth interest mentioned therein. The complainant's memory is again clearly at fault, and his version of the particular fact palpably erroneous.

On November 3, 1874, the first two notes of Stone, for $500 each, executed under the contract of May 8, 1874, were delivered up to him, he agreeing to pay the amount in monthly instalments of $75, or sooner out of profits if realized. On November 13, 1874, the parties seem to have entered into written articles of partnership, "for the purpose of disposing of privileges" under the letters-patent.

On June 12, 1875, says the bill, matters having become

quite complicated, and complainant being anxious to close up the business in some way, " agreed to certain compromise terms, which were reduced to writing," * * * " by which all the shop-right transfers were to be annulled, and each party placed *in statu quo* in regard to that part of the former transaction; and the said Stone was to deliver to complainant said title-bond for 300 acres of land, unencumbered, in full satisfaction of all of complainant's demands against him, and then complainant was to surrender to him the deed to Julia T. Walton; and said Stone was to prosecute the business for two years at his own expense, and, for doing so, he was to have half of the profits that he might derive from his management and sale of said patent-right for said term of two years," paying the complainant a royalty of $1 for each set of four wheels made. The bill also says that Stone was to deliver the Chester bond within ninety days from the date of the contract, which he has failed and refused to do; nor has he complied with the said contract in any particular, " but complainant has, at all times, been ready and willing to comply with his part of this contract, and all others made by him."

The agreement of June 12, 1875, does provide that Stone and Blackman, " in consideration of the mutual and respective performance thereof," agree as herein stipulated. Stone agrees to annul, from the date thereof, the shop-right transfer, and to convey, upon his obtaining possession thereof, the Chester title-bond; Blackman agrees to convey, " in like unencumbered manner," the bond delivered to Blackman for Julia T. Walton, " and to give said Stone receipt in full payment of all dues, obligations, or accounts owing by said Stone to said Blackman." Blackman further agrees that Stone " shall have the management of the Blackman patent-wheel business for two years from date hereof," and shall have, in full consideration of his labor and expense in said business, an additional one-eighth to the three-eighths said Stone now owns, in all proceeds,

arising in any manner from Stone's management or agency within said term of two years. " Of said additional one-eighth, said Blackman's portion to give said Stone will be one-fifth of said Blackman's three-eighths in the wheel-invention or patent above mentioned. The said Blackman is to give said Stone power of attorney from date hereof, for two years, to contract and sell the privilege of making and vending said Blackman's patent wheel for vehicles, at a *minimum* royalty of one dollar per set of four wheels. If said bond now in hands of Saunders or assigns is not tendered said Blackman within ninety days from date hereof, he shall have the privilege of annulling clause in this contract concerning bonds."

In his bill, the complainant says he has at all times " been ready and willing to comply with his part of this contract." In his deposition, however, he says that when the power of attorney — which was drawn up on the same day, in accordance with the contract, and executed by him — was returned executed by Schwenck, he refused to allow it to be delivered, and erased his name. He adds : Stone " was very anxious to receive it (the power of attorney), and wrote me a letter thereon, and endeavored to persuade me to allow the power of attorney to be delivered, that he might go forward in the sole management of this wheel business ; but I would not consent." The letter thus referred to bears date June 15, 1875.

The bill in this case was filed on October 30, 1875, and candidly admits that matters had become "very complicated." In fact, they fairly rival the " intricate web " of Corneille's tragedy of " Heraclius," which, says Gibbon, " requires more than one representation to be clearly understood, and which, after an interval of some years, is said to have puzzled the author himself." The present complication is even worse, for it required no interval of years to puzzle its author, his lawyer, his antagonists, and the court. The prayer of the bill is, that the rights of the parties be

declared and decreed; that all proper accounts be taken; that the tenancy in the patent-right be closed by a sale of the same, and a division of the proceeds, if, indeed, there be any proceeds, etc. The answer of Stone, filed also as a cross-bill, on June 8, 1876, admits the facts to be as herein before recited, and insists upon a rescission of all the contracts, on the ground of the false representations of Blackman in regard to the patent, the falsehood of which the defendant insists was discovered after August 4, 1875, and the worthlessness of the patent.

There is nothing in this record to show that the patent in controversy is not valid, and the invention claimed precisely what it purports to be. There is evidence strongly persuasive that the patent is not pecuniarily valuable, because the cost of putting the patented article on the market is too great to pay a royalty, and yet compete with other wheels. It is not absolutely certain, however, that this point has been so thoroughly tested as to leave no room for doubt. The Columbus Blackman Military-Wheel Company seems to have spent far the larger part of its funds in the erection of buildings, the purchase of machinery, and incidental expenses, leaving a mere pittance to be used in the main purpose of the organization, and only a few wheels were actually made. Even these few may, however, have been sufficient to show the cost of manufacture; and it is the prime cost which constitutes the leading element of the problem. This company had made its experiments, and ceased to manufacture the wheels before the defendant Stone bought an interest in the patent. He admits knowledge of the fact, and that he actually visited Columbus, saw the manufactory, and the contract under which the company was working, before he had his contracts with Blackman recorded, on August 4, 1875, at Washington. He also knew what had been done at Nashville in the way of putting the wheel on the market. His letters show that he conversed with the complainant Schwenck fully in regard to the efforts of A. L.

Blackman & Co. in the premises. Nothing but the grossest ignorance or innocence on his part, or the grossest careless-ness, prevented him from accurately ascertaining, within a year after his first purchase, all the facts upon which he now relies for relief. He expressly admits, moreover, that he acted upon his contracts after he became fully advised of the consideration which passed between Blackman and Saunders for the transfer of July 6, 1874, and that he did not intend to seek a rescission upon the ground of such dis-covery. Under these circumstances, I can see no sufficient reason for interfering with the contract of that date, or for relieving the defendant from his legal liability on the two notes for $500 each, executed to Saunders on that occasion. The evidence fails to implicate Saunders in any fraud, if any fraud were committed, to Stone's injury.

Whatever may have been Stone's right to relief by recis-sion as against Blackman, if he had taken prompt steps for that purpose, I think that he has lost that right by delay. He certainly insisted upon his rights as purchaser as late as August 4, 1875, when he caused his titles to be recorded at Washington. He contended for these rights for several months thereafter, and took no active step to rescind until the filing of his answer and cross-bill in this cause, on June 8, 1876. *Grymes* v. *Sanders*, 93 U. S. 55; *Knuckolls* v. *Lea*, 10 Humph. 577; *McDowell* v. *Simms*, Busb. Eq. 130.

On June 12, 1875, Blackman owned an undivided inter-est, in the patent, of three-eighths; Schwenck, two-eighths; and Stone, three-eights. For his three-eighths Stone was indebted in the two notes given to Saunders, and for a balance due to Blackman on his obligation to pay $75 a month to the extent of $1,000, the two notes of $400 each having been paid. The liability to pay $20,000 in pros-pective profits was extinguished by the obligation to make the deed to Julia T. Walton for 200 acres of the 300 acres of land in the Chester title-bond, the land itself being held by Saunders, or his assignee, Johnson, as collateral security

for the two $500 notes. By the agreement of June 12, 1875, all matters between Blackman and Stone were intended to be compromised and settled. Stone was to annul the transfer of shop-right, and to convey — the contract does not say to whom, but presumably to Blackman — the Chester title-bond unencumbered. Blackman was to convey — presumably to Stone — the Walton bond, unencumbered, " and to give Stone a receipt in full payment of all dues, obligations, or accounts owing by said Stone to said Blackman." There is a provision, at the close of the agreement, that if the Chester bond is not tendered within ninety days, Blackman is to have the privilege of annulling the clause of the agreement " concerning bonds." The effect of acting on this privilege would be to strike out all of the contract touching the Chester and Walton bonds, leaving the rest of the contract in full force. In that event, Stone would be released from the obligation to convey the Chester title-bond, and Blackman, for Walton, would hold the Walton title-bond. But this would be greatly to the disadvantage of Blackman, and there is nothing in the record to show that he has exercised, or ever intended to exercise, the privilege. The agreement, consequently, in this regard remains in full force. Blackman is entitled to the value of the Chester land, and Stone to the delivery of the Walton bond, and a receipt in full from Blackman of all other dues. The value of the land would either be the price fixed by the title-bond, namely, $5 per acre, or, at the election of either party, what the proof might show it was on June 12, 1875, or at the expiration of ninety days thereafter. But the agreement of June 12, 1875, contained another stipulation, entirely for the benefit of Stone. It provided that Stone should have the management of the Blackman patent-wheel business for two years, from June 12, 1875, and should receive an additional one-eighth of the proceeds to the three-eighths already owned by him. And Blackman bound himself to give Stone a power of attorney, for the two years, to sell the privilege of making and vending

the patent wheel. Blackman himself proves that he refused to carry out this part of the contract. Having thus violated the agreement, he is in no condition either to set it aside or to enforce it in equity. In strictness, all this court could do would be to dismiss his bill, leaving him to his remedy at law, if he have any. But, obviously, it is to the interest of all parties that the litigation should be ended, and the complications straightened out on almost any terms. I have concluded, therefore, to approximate the justice of the case as near as I can. Stone will be out of pocket the two notes to Saunders, and the money paid Blackman, about $1,200 more. Blackman is in no condition to deny the value of his patent, and that the exclusive management of it would be profitable. Before he can recover the value of the Chester land, he must account to Stone for the damages the latter has sustained by reason of his failure to give the power of attorney for two years agreed upon. What these damages are is, of course, altogether uncertain, but the record enables us to estimate them as well now as at any other time. Conceding that the damages would be something, — and certainly Blackman is estopped to dispute the fact, — I am of opinion that, for the two years, they may be estimated at the value of the Chester land, and be fairly set off against that value. I am the better satisfied with this conclusion as there is some plausibility, to say the least, in Stone's claim to be reimbursed by Blackman for one-half the Saunders debt.

The result is to cancel the Walton bond, and to release Stone from all obligations to convey the Chester bond, and from all dues, obligations, or accounts owing by him to Blackman; and Blackman is released from all further liability on the contract of June 12, 1875, by reason of his violation of it. He will own three-eighths, Stone three-eighths, and Schwenck two-eighths of the patent, which may be sold for division.

The complainants will pay one-half the costs, and Stone the other half.